IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DAVID WOOD,                    )
                               )
    Plaintiff,                 )
                               )
        v.                     )    1:11cv827 (JCC/JFA)
                               )
SYMANTEC CORPORATION,          )
                               )
    Defendant.                 )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Symantec Corporation's ("Defendant" or "Symantec") Motion for Summary Judgment.  [Dkt. 27.]  For the following reasons, the Court will grant Defendant's Motion.

**I. Background**

This case arises out of a dispute between Symantec and its former employee, Plaintiff David Wood ("Plaintiff" or "Wood"), over alleged unpaid commissions.

A.    Factual Background

1.    Wood's Employment at Symantec

Symantec is a computer software company that provides storage and systems management solutions to individual consumers, small businesses, and large organizations.  (Def.'s Mem. [Dkt. 28] Statement of Undisputed Facts ("Def.'s Facts") ¶ 1.)  In March 2009, Wood was a Senior Account Manager at

1

Symantec.  (Def.'s Facts ¶ 2.)  Wood's job was to sell Symantec products and services to the public sector, including the federal government.  (*Id.*)

At that time, Wood's compensation was governed by the Fiscal Year 2009 Symantec Sales and Services Compensation Program Guide (the "FY 2009 Program Guide").  (Def.'s Facts ¶ 3.)  Sales employees like Wood were paid a base salary as well as commissions based on their performance.  (Def.'s Facts ¶¶ 4-5.)

## 2.   The Carahsoft Contract

During his employment, Wood worked on a licensing agreement between Symantec and Carahsoft Technology Corporation (the "Carahsoft Contract").  (Wood Dep. [Def.'s Mem. Ex. 1] at 36:12-37:12.)  The Carahsoft Contract was executed on April 1, 2009. (Def.'s Facts ¶ 12.)  While the contract was with Carahsoft Technology Corporation, it allowed the United States Army to purchase Symantec products.  (*Id.*)  The Carahsoft Contract contained a base year and two option years that could be exercised by the customer.  (Def.'s Facts ¶ 13.)  During the base year, the Army could use an unlimited quantity of specified Symantec Products.  (Def.'s Facts ¶ 16.)  The amount due and payable for the base year was approximately $11.1 million. (Def.'s Facts ¶ 15; Wood Dep. at 41:7-18.)  The Army was contractually committed to the base year only, and was not

required to exercise the option years.  (Def.'s Facts ¶ 14.)
Thus, in order for Symantec to be paid beyond the amount due and
payable for the base year, the Army would have to exercise the
option years.  (*Id.*)

In September 2008, Wood proposed a deal containing a
contractual commitment close to $50 million, and which set forth
the possibility of external financing.  (Def.'s Facts ¶ 17.)  In
order to obtain external financing, Symantec would have to pay a
financing company or reseller a fee to finance the deal.  (*Id.*)
However, a multi-year deal with external financing eventually
became unworkable.  (Def.'s Facts ¶ 18.)  Wood continued to
lobby for a deal with external financing, however, because it
would increase the Army's contractual commitment, and hence
increase his commissions.  (Def.'s Facts ¶¶ 19-20.)  Wood
eventually advocated a deal with a base year of approximately
$12 million and an unlimited license, recognizing the high
likelihood that the Army would exercise the option years.
(Def.'s Mem. Ex. 10.)  The Carahsoft Contract was ultimately
executed without external financing. (Def.'s Facts ¶ 25.)

### 3.   The FY 2009 Program Guide

Wood was a "Plan Participant" as defined in the FY 2009
Program Guide.  (Opp. [Dkt. 33] Additional Facts ("Pl.'s Facts")
¶ 3.)  As a Plan Participant, Wood was assigned to a specific
territory and given a quota.  (Def.'s Facts ¶ 4; FY 2009 Program

Guide [Def.'s Mem. Ex. 2] §§ 2.2, 7.1.)  Wood's commissions were based on eligible products and services sold within his territory and for which he carried a quota.  (Def.'s Facts ¶ 4; FY 2009 Program Guide §§ 1.5, 3.1, 3.2.)

The FY 2009 Program Guide provided that "[c]ommissions are earned when Symantec receives full payment from the customer unless the deal falls within the Windfall Clause . . . in which case there are no earnings until a decision is made by Symantec regarding the windfall."  (Def.'s Facts ¶ 7; FY 2009 Program Guide § 1.6.)  The guide further states that "[o]nly transactions which have been forecasted, approved and invoiced are eligible for Commissionable Bookings Credit."  (Def.'s Facts ¶ 7; FY 2009 Program Guide § 1.6.)  Commissionable Bookings Credit is in turn defined as the amount credited to the territory and against the quota for commission purposes.  (Pl.'s Facts ¶ 7; FY 2009 Program Guide § 1.5).  Section 4 of the FY 2009 Program Guide further addresses Commissionable Bookings Credit, and provides in part that:

> An order for both products and/or services must be a binding commitment on both the third-party (customer or partner) and Symantec.  No caveats, cancellation clauses, Availability of Funds (AOF) clauses (which must be immediately billable on standard payment terms)[,] non-standard payment terms, contingencies, acceptance clauses, or provisions are allowed without prior approval of the Geography Senior Vice President and Geography Finance Controller.

4

(Def.'s Facts ¶ 7; FY 2009 Program Guide § 4.8.)   Section 4.11 reiterates that "[t]he appropriate Geography Senior Vice-President and Geography Finance Controller must approve all non-standard payment terms."   (Def.'s Facts ¶ 7; FY 2009 Program Guide § 4.11.)

Symantec reserved the right "to amend the Program Guide and related policies and procedures prospectively or retroactively with or without prior written notice" and "at its complete discretion."   (Def.'s Facts ¶ 7; FY 2009 Program Guide § 2.3.) Symantec also reserved the right to "make changes in Program Guide eligibility at any time" and to "modify at its complete discretion Quotas based on a number of conditions . . . ."   (Def.'s Facts ¶ 7; FY 2009 Program Guide §§ 2.4, 2.5.)   Modifications to the FY 2009 Program Guide required "the prior written approval of the Executive Compensation Committee, made up of Executive Compensation Committee, made up of Executives from Sales, Services and Finance Organizations."   (Def.'s Facts ¶ 7; FY 2009 Program Guide § 2.7.)

Wood received the FY 2009 Program Guide in May 2008 and accepted its terms.   (Def.'s Facts ¶ 8.)

4.   Wood's Compensation on the Carahsoft Contract

Pursuant to the FY 2009 Program Guide, Wood was paid commission based on the Army's contractual commitment on the Carahsoft Contract, *i.e.*, the approximately $11.1 million due and payable for the base year.   (Def.'s Facts ¶ 31.)   Wood met with

one of his supervisors, Jim Russell, about compensation in April 2009. (Def.'s Facts ¶ 34.) Russell was a vice president responsible for Symantec's public sector business unit until October 2009. (*Id.*) Wood sent Russell a memo he drafted concerning compensation on the Carahsoft Contract (the "compensation memo"). (Def.'s Mem. Ex. 13.) When Wood and Russell met, they discussed two courses of action: (1) an adjustment to Wood's quota for fiscal year 2010, and (2) paying the team "off plan." (Def.'s Facts ¶ 35; Def.'s Mem. Ex. 14.)

Wood also spoke with another supervisor, David Connor, about his compensation. (Def.'s Facts ¶ 37.) In May 2009, Wood sent Connor an e-mail, which included the compensation memo as well as three proposals for how the sales team could be compensated. (Def.'s Facts ¶ 38; Def.'s Mem. Ex. 15.) Wood asked Connor that compensation for the Carahsoft Contract be "non-standard" or "off plan." (Def.'s Mem. Ex. 15.)

In June 2009, Wood met with his three supervisors, Russell, Connor, and Doug Martin. (Def.'s Facts ¶ 41.) Wood sent an e-mail confirming the meeting, in which he referenced discussions with Rich Spring and Bill Robbins, both of whom had authority levels higher than Russell with respect to the Carahsoft Contract. (Def.'s Facts ¶ 41; Russell Dep. [Def.'s Mem. Ex. 6] at 14:10-13; Def.'s Mem. Ex. 16.) As set forth in the e-mail, these discussions reflected that the Carahsoft

Contract was "recognized by Symantec as a 1 year deal," that the sales team was "paid according to [its] FY09 compensation plan," and that "Bill [Robbins] and Rich [Spring] will not entertain taking the Army ELA [*i.e.*, the Carahsoft Contract] off plan for the sales team to realize a fixed payment upon the second and third payments by the Army."   (Def.'s Facts ¶ 41; Def.'s Mem. at 11 n.6 ; Def.'s Mem. Ex. 16.)   Wood also stated in the e-mail that these discussions did not adequately compensate the sales team and did not align with previous discussions regarding compensation.  (Def.'s Mem. Ex. 16.)   According to Wood, he was told "get the deal done and then we will discuss payment" and "I want to get you paid.  I am trying to get you paid."   (Def.'s Mem. Ex. 16; Wood Dep. at 141:5-142:4.)

In October 2009, Gigi Schumm became Symantec's vice president and general manager of the public sector business unit. (Def.'s Facts ¶ 44.)  Wood, as well as Brian Booker, another member of Wood's sales team, raised the issue of compensation with Schumm, including the amount of money they were paid on the Carahsoft Contract.  (Def.'s Facts ¶¶ 46-47; Schumm Dep. [Def.'s Mem. Ex. 4] at 20:14-21:16.)   Wood met with Schumm in October 2009 and presented her with his compensation memo.  (Def.'s Facts ¶ 48.)  Wood (and Booker) argued that the Carahsoft Contract should be treated as a three-year deal as opposed to a one-year deal, and informed Schumm about various proposals submitted to

Russell and Connor.  (Def.'s Facts ¶ 49; Schumm Dep. at 20:14-21:16.)  Schumm thereafter inquired about the sales team's compensation on the Carahsoft Contract, speaking with Martin, who was Wood and Booker's direct supervisor, as well as Spring and Robbins.  (Def.'s Facts ¶ 52; Schumm Dep. at 20:3-13.)  She discovered that the sales team would not be paid off plan on the Carahsoft Contract, that this decision was final, and informed Wood of the same.  (Def.'s Facts ¶¶ 52-53; Schumm Dep. at 22:12-19.)

### B.   Procedural Background

On June 23, 2011, Wood filed suit in Fairfax County Circuit Court alleging breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), and breach of implied contract (Count III).  [Dkt. 1-3.]  Symantec was served with the Summons and Complaint on July 18, 2011.  [Dkt. 1.]  On August 5, 2011, Symantec timely removed the action to this Court based on diversity of citizenship.  [Dkt. 1.]

Symantec filed a Motion for Summary Judgment on January 5, 2012.  [Dkt. 27.]  Wood filed his opposition on January 12, 2012 [Dkt. 33], to which Symantec replied on January 18, 2012 [Dkt. 34].  Symantec's Motion for Summary Judgment is before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted).  The party seeking summary judgment has the initial burden of showing the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party must come forward and show that a genuine dispute exists.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party opposing summary judgment may not rest upon mere allegations or denials.  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quotation omitted).

Unsupported speculation is not enough to withstand a motion for summary judgment.  *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is appropriate when, after discovery, a party has failed to make a

"showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In reviewing the record on summary judgment, the court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III. Analysis

A. <u>Governing Law</u>

As this case arises from an alleged breach of contract, the Court must determine what law governs its terms. A federal court sitting in diversity must apply the substantive law of the forum state, including its choice of law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citations omitted). Under Virginia choice of law rules, the law of the place of performance governs contract payment and performance issues such as those involved here. *Elite Entm't, Inc. v. Khela Bros. Entm't, Inc.*, 396 F. Supp. 2d 680, 692 (E.D. Va. 2005) (citation omitted). Because payment based on the FY 2009 Program Guide was to be performed in Virginia, Virginia law governs.[1]

---

[1] The parties did not analyze Virginia choice-of-law rules, but rely exclusively on Virginia law in their briefs. The Court therefore also

B.    Breach of Contract

In Count I, Wood alleges that Symantec breached the FY 2009 Program Guide by failing to pay him the commissions he was owed on the Carahsoft Contract.   Under Virginia law, the elements of a claim for breach of contract are (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of the obligation, and (3) an injury or harm to the plaintiff caused by the defendant's breach.   *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (Va. 2006).   The principles governing contract interpretation are well established.   "[W]hen the terms in a contract are clear and unambiguous, the contract must be construed according to its plain meaning."   *Parikh v. Family Care Ctr., Inc.*, 273 Va. 284, 288 (Va. 2007); *see also Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 405 (4th Cir. 1998) ("Virginia strictly adheres to the 'plain meaning' rule, entitling the parties to rely on the express terms of the written agreement.").   Courts must look to "the intention of the parties as expressed by them in the words they have used, and [ ] are bound to say that the parties intended what the written instrument plainly declares."   *Meade v. Wallen*, 226 Va. 465, 467 (Va. 1984) (quoting *Magann Corp. v. Elec. Works*, 203 Va. 259, 264 (Va. 1962)).

---

assumes that the parties assent to application of Virginia law.  *See Rutherford v. John Hancock Mut. Life Ins. Co.*, 562 F.2d 290, 292 n.2 (4th Cir. 1977).

Symantec argues that Wood was paid in accordance with the FY 2009 Program Guide, and hence no contract has been breached.  The FY 2009 Program Guide provides that commissions are earned only on transactions which have been invoiced and when a "binding commitment" has been received.  (FY 2009 Program Guide §§ 1.6, 4.8.)  Wood concedes that the Carahsoft Contract contained a contractual commitment of approximately $11.1 million.  (Wood Dep. at 41:7-18, 126:6-10, 228:7-15.)  He further admits that he was paid commissions on this amount pursuant to the FY 2009 Program Guide.  (Wood Dep. at 41:20-42:2.)

Despite these concessions, Wood advances a series of arguments as to why summary judgment is inappropriate. Specifically, he contends that there are genuine issues of material fact, which can roughly be broken down as follows: (1) whether the Carahsoft Contract was a nonstandard transaction, and (2) whether Russell made a binding promise following the closing of the Carahsoft Contract to pay Wood commission based on the three-year value of the contract.  The Court addresses each argument in turn.

### 1.   Nonstandard Transaction

Wood cites the deposition testimony of Schumm and Booker to support the notion that the Carahsoft Contract was a nonstandard transaction.  (Pl.'s Facts ¶ 11; Opp. at 22-23.)

Wood, however, fails to produce any evidence demonstrating that the Carahsoft Contract contained nonstandard terms with respect to *his payment*. (*See* Opp. at 22 (arguing that the Carahsoft Contract was unique insofar as it granted the customer an unlimited license and the customer did not pay for the entire license up front).)

Wood argues that because the Carahsoft Contract contained nonstandard terms, certain provisions in the FY 2009 Program Guide become subject to the reasonable interpretation that the Carahsoft Contract is an "order" and qualifies as a Commissionable Bookings Credit in its entirety. (Opp. at 23 (citing FY 2009 Program Guide §§ 4.1, 4.2, 4.8).) Wood's interpretation, however, runs counter to the plain language of the very provisions he cites. For example, Section 4.2 of the FY 2009 Program Guide provides that "Enterprise Services bookings are considered commissionable transactions under the Program *when Symantec has received end user commitment*." (FY 2009 Program Guide § 4.2 (emphasis added).) Section 4.8 similarly states that "[a]n order for both products and/or services *must be a binding commitment* on both the third-party (customer or partner) and Symantec." (FY 2009 Program Guide § 4.8 (emphasis added).) Section 4.8 further provides that "no . . . non-standard payment terms . . . are allowed without prior approval of the Geography Senior Vice President and Geography

13

Finance Controller.[2]  (*Id.*)  Even assuming the Carahsoft Contract did contain nonstandard terms as Wood contends, he fails to advance a coherent reading of the contract which would suggest that Symantec was thereby required to pay him in a nonstandard or off plan manner.

Wood next contends that the Carahsoft Contract qualifies as an "installment transaction."  (Opp. at 24.) Symantec's Installment Billing Policy defines "License Installment Deal" as "[a]n arrangement that includes a contractual commitment to pay for license and/or multi years of maintenance with license fees to be spread over multiple payments."  (Opp. Ex. 8 at 3.)  The Carahsoft Contract does not fit this definition, however, given that the contractual commitment was for one year and the two additional years were options.[3]  This, in fact, Wood concedes.  (Wood Dep. at 126:6-20.)  Moreover, Wood points to no evidence in the record suggesting that multiple payments were due for the base year. Rather, in a section entitled "Payment Terms," the Carahsoft Contract states that approximately $11.1 million is "due and payable" for the base year, and refers to the additional years

---

[2] Wood offers no evidence demonstrating that nonstandard payment terms were ever approved for the Carahsoft Contract through proper channels.  *See* Section III.B.2, *infra*.

[3] In the introduction of his brief, Wood states that there is a genuine issue of material fact as to whether the Carahsoft Contract was internally financed, and that Wood is thereby entitled to commissions pursuant to the Installment Transaction provisions of the FY 2009 Program Guide and Symantec's Installment Billing Policy.  Wood fails to explain what he means by "internal financing," or how this would make the Carahsoft Contract an installment transaction.

as options.  (Carahsoft Contract [Def.'s Mem. Ex. 5] § 6.)  Wood

cannot by incantation turn a one-year contractual commitment

into a three-year installment transaction contrary to the plain

terms of the contract.  In any event, even if payment for the

base year were due in multiple installments, Wood produces no

evidence that he would consequently be entitled to nonstandard

commissions.

Lastly, Wood turns to the so-called windfall clause of

the FY 2009 Program Guide.  (Opp. at 24.)  Specifically, Section

16.1 of the program guide provides that "[a]ny deal that exceeds

the Territory's forecasted annual quota by 125% is considered a

windfall.  Compensation paid on such deals will be handled

outside the Compensation Plan at the sole discretion of Sales

Management and Sales Finance."  (FY 2009 Program Guide § 16.1.)

Wood and Booker collectively carried a quota of $13,680,000 for

fiscal year 2009.  (Pl.'s Facts ¶ 31.)  Wood contends that if he

had been paid commission as promised by Russell, *i.e.*, based on

the three-year value of the Carahsoft Contract, then the

contract would exceed 125 per cent of the annual quota and,

thus, qualify as a "windfall."

There are two problems with this argument.  First, as

discussed more fully in Section III.B.2, *infra*, Wood fails to

offer evidence demonstrating that Russell had the authority to

calculate Wood's commissions off plan.  Rather, the record

15

indicates that Russell lacked the power to do so.  If the
Carahsoft Contract were applied towards Wood's quota in the
manner prescribed by the FY 2009 Program Guide, *i.e.*, using the
amount that the Army was contractually committed to pay (*see* FY
2009 Program Guide §§ 1.6, 4.8), it would not exceed 125 per
cent of his quota.[4]

Second, even if the Carahsoft Contract were a
windfall, the provision quoted by Wood states that such a deal
will be handled outside the FY 2009 Program Guide "*at the sole
discretion of Sales Management and Sales Finance.*"  (FY 2009
Program Guide § 16.1 (emphasis added).)  Section 1.6 similarly
states that "[c]ommissions are earned when Symantec receives
full payment from the customer unless the deal falls within the
Windfall Clause . . . *in which case there are no earnings until
a decision is made by Symantec regarding the windfall.*"  (FY
2009 Program Guide § 1.6 (emphasis added).)  Thus, assuming the
Carahsoft Contract were a windfall, the 2009 FY Program Guide
confers on Symantec complete discretion to determine
commissions.  The windfall clause is, therefore, no help to
Wood.  *See McCormick v. Level 3 Commc'ns, LLC*, 261 F. Supp. 2d
476, 480 (E.D. Va. 2003) (finding no breach of contract where
windfall provision reserved for employer the right to limit the
amount of commissions).

---

[4] To review, the amount the Army was contractually committed to pay on the
Carahsoft Contract was approximately $11.1 million, or 81.1 per cent of
Wood's quota of $13,680,000.

In sum, even assuming the Carahsoft Contract were nonstandard, Wood fails to demonstrate that he was thereby entitled to nonstandard commissions.  On the contrary, the FY 2009 Program Guide contains no terms requiring Symantec to pay commissions off plan solely because a transaction is in some way nonstandard.  In essence, Wood seeks to introduce terms into the FY 2009 Program Guide that simply are not there.  This, of course, is something he cannot do.  *See Sabet v. E. Va. Med. Auth.*, 775 F.2d 1266, 1270 (4th Cir. 1985) (rejecting "novel theory of contract law, which would bind a party to perform an action that it never agreed to perform and which is totally inconsistent with what it had stated it would do").  For these reasons, Wood's argument that the Carahsoft Contract was a nonstandard transaction fails to raise a genuine issue of material fact.

### 2.   Russell's Alleged Promise

In the introduction of his opposition, Wood cites Russell's alleged promise regarding his compensation as a genuine issue of material fact precluding summary judgment.  Wood cites his deposition testimony, as well as that of Booker, in support of his assertion that Russell promised to pay the sales team on the three-year value of the Carahsoft Contract.  He fails, however, to elaborate on this argument in his brief.  E-mails in the record indicate not that Russell made such a

17

promise, but rather that he was exploring alternative ways of paying the sales team. (*See, e.g.*, Def.'s Mem. Ex. 14 (e-mail from Wood reflecting two courses of action that Russell was working on for the sales team).) Wood nevertheless asserted in his deposition that Russell promised to pay him on the three-year value of the deal in person and over the phone. (Wood Dep. at 111:11-19.) But even if Russell did promise this, the record indicates that he lacked the authority to do so.[5] Specifically, Section 4.8 of the FY 2009 Program Guide provides that "no . . . non-standard payment terms . . . are allowed without prior approval of the Geography Senior Vice President and Geography Finance Controller." (FY 2009 Program Guide § 4.8.) Russell, however, was a vice president, not a senior vice president. (Russell Dep. at 7:4-6.) The record also reflects that Russell's superiors consistently refused to pay Wood's commission off plan. (Def.'s Mem. Ex. 16. (e-mail from Wood indicating that Spring and Robbins would not entertain taking the Carahsoft Contract off plan and paying the sales team commissions on the option years).) In sum, the Court finds no genuine issue of material fact suggesting that Symantec failed

---

[5] At oral argument, Wood's counsel cited Symantec's answer to an interrogatory as evidence that Russell had the authority to pay Wood in a nonstandard manner. In its response to the interrogatory, however, Symantec merely stated that Russell, in addition to two other individuals, "*had involvement* in determining the commissions paid to Plaintiff during the time period that is the subject of this lawsuit." (*See* Opp. Ex. 3 at 17 (emphasis added).) As Symantec pointed out, there are many factors which contribute to the determination of an employee's commission, *e.g.*, setting the employee's quota. Contrary to Wood's assertion, Symantec's response does not indicate that Russell had the authority to pay Wood off plan.

to pay Wood in accordance with its contractual obligations.
Accordingly, the Court grants summary judgment as to Wood's
breach of contract claim.

      C.   <u>Breach of the Covenant of Good Faith and Fair
          Dealing</u>

      In Count II, Wood alleges that Symantec breached the
covenant of good faith and fair dealing by failing to abide by
its promise to pay him on the three-year value of the Carahsoft
Contract.  In Virginia, "when parties to a contract create valid
and binding rights, an implied covenant of good faith and fair
dealing is inapplicable to those rights." *See Ward's Equip. v.
New Holland N. Am.*, 254 Va. 379, 385 (Va. 1997).  As a
corollary, a party does not breach an implied duty when it
exercises its rights created by contract. *Skillstorm, Inc. v.
Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009);
*see also Omega World Travel v. TWA*, 111 F.3d 14, 17 (4th Cir.
1997) (noting that under Virginia law an implied duty of good
faith and fair dealing cannot override explicit contractual
terms).  Here, the FY 2009 Program Guide governed Wood's
compensation on the Carahsoft Contract.  Because the evidence
demonstrates that Symantec acted in accordance with its
contractual obligations, summary judgment is appropriate as to
Wood's claim of breach of the covenant of good faith.

D.   Breach of Implied Contract

Wood's breach of implied contract claim is based on an alleged promise by Schumm to set his quota in a manner that would make up for the commissions he was allegedly owed on the Carahsoft Contract.  (Opp. at 26-27.)  According to Wood, the implied contract was breached when Symantec terminated his employment, preventing him from recouping the unpaid commissions.  (*Id.*)  However, the FY 2009 Program Guide was an express written contract, which Wood accepted and which governed the payment of his commissions on the Carahsoft Contract.  As discussed above, Wood fails to create a genuine issue of material fact as to whether his commissions on the Carahsoft Contract were ever taken off plan.  Because the FY 2009 Program Guide controls, Wood cannot advance an implied contract theory contrary to the terms of the express contract.  *See S. Biscuit Co., Inc. v. Lloyd*, 174 Va. 299, 311 (Va. 1940) ("[A]n express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter. . . . [T]he law will not imply an agreement in contravention thereof.")  Were the Court to imply a contract to pay Wood commissions based on the three-year value of the Carahsoft Contract, it would undermine the express written agreement of the parties.  *See Jafari v. Old Dominion Transit Mgmt. Co.*, No. 3:08cv629, 2008 WL 5102010, at

20

*8 (E.D. Va. Nov. 28, 2008), *aff'd in relevant part* --- F. App'x ----, 2012 WL 251957 (4th Cir. Jan. 27, 2012).  Accordingly, the Court cannot imply a contract based on Schumm's alleged promise to Wood.

### IV.   Conclusion

For these reasons, the Court will grant Defendant's Motion for Summary Judgment.

An appropriate Order will issue.

<table>
<tr><td></td><td>/s/</td></tr>
</table>

February 2, 2012                  James C. Cacheris
Alexandria, Virginia         UNITED STATES DISTRICT COURT JUDGE